IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| NAUTILUS INSURANCE COMPANY, | ) ) ) | CV. NO. 10-00605 DAE-RLP<br>Declaratory Judgment |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| HAWK TRANSPORT SERVICES, LLC, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

ORDER GRANTING NAUTILUS INSURANCE COMPANY'S MOTION FOR
SUMMARY JUDGMENT

On June 14, 2011, the Court heard Nautilus Insurance Company's

Motion for Summary Judgment ("Motion"). Hiroyuki Shayne Takei, Esq., and J.

Patrick Gallagher, Esq., appeared at the hearing on behalf of Plaintiff Nautilus

Insurance Company ("Nautilus") and Patrick K. Shea, Esq., appeared on behalf of

Defendant Hawk Transport Services, LLC ("Hawk"). After reviewing the motion

and the supporting memoranda, the Court **GRANTS** Nautilus's Motion for

Summary Judgment (Doc. # 18).

BACKGROUND

I.     Underlying Suit

This Declaratory Judgment action stems from an underlying suit filed

on March 15, 2010 and currently pending in the United States District Court for the

District of Hawaii before United States District Judge J. Michael Seabright.  See

Teruya v. Shaw, Cv. No. 10-00282 ("Underlying Suit").  ("PCSF," P.'s Separate

and Concise Statement of Facts, Doc. # 19 ¶ 1.)

The Underlying Suit relates to hazardous solid waste discovered on

property located at 87-1161 Hakimo Road, Waianae, Hawaii (the "Property.")  (Id.

at ¶ 2.)   Underlying Plaintiff Peter Teruya ("Teruya") alleges he purchased the

Property on October 10, 2004, which currently consists of ten acres of agricultural

land.  (See "Underlying Compl.," Doc. # 1-1, ¶¶ 36, 18.)  Teruya alleges that

Underlying Defendant Pricilla D. Shaw ("Shaw") acquired a twenty year lease in

the Property (the "Lease").  (Id. ¶ 37.)  The Lease, according to Teruya, states that

"[t]he Property shall be used only for the purposes of planting, growing and

harvesting . . . crops."  (Id. ¶ 39.)  Shaw, however, allegedly used the Property "for

various operations in violation . . . of the Lease, including but not limited to

recycling food, glass and metal, burning waste, and as a junkyard."  (Id. ¶ 40.)

Teruya also claims the lease prohibits subleasing, but that Shaw sublet portions of

the Property to Defendant Ivory Transport and Equipment Rentals, LLC ("Ivory Transport") among others.  (Id. ¶¶ 41–44.)

On or around June 12, 2008, Hawk and/or Frank Coluccio Construction Company ("Coluccio") subcontracted Ivory Transport to transport solid and/or hazardous waste to the Property from Kapiolani Boulevard.  (Id. ¶ 49.) Teruya alleges Ivory Transport, Hawk, and/or Coluccio, with permission from Shaw, transported the solid and/or hazardous waste to the Property on or around the same day.  (Id. ¶ 50.)

On May 13, 2008, the United States Environmental Protection Agency ("EPA") and the State of Hawaii Department of Health ("DOH") began a joint site inspection of the Property.  (Id. ¶ 62.)  During the inspection Teruya alleges that the EPA and DOH found: numerous containers of waste oil, paints, solvents and greases; lead acid batteries and associated wastes; open burn pits; five-gallon buckets and drums; a graded and filled area that appeared to have been used for industrial activities; used sand blast grit on the graded and filed area; piles of ash and burnt metal debris; fill material which appeared to have been filed with a mixture of construction and demolition debris' and a metal scrapping and salvaging operation.  (PCSF ¶ 10.)  Teruya alleges the EPA colleted and analyzed

over 1200 soil samples from the Property which documented the presence of hazardous substances.  (Id. ¶ 11.)

In February and March 2009, the EPA took control of the Property for its removal action.  (Underlying Compl. ¶ 76.)  Teruya alleges that the EPA moved more than 1,000 tons of solid and hazardous wastes, lead acid batteries and contaminated soil from the property.  (Id. ¶ 72; PCSF ¶ 12.)  The EPA allegedly incurred total site costs of $650,667.87 as of July 31, 2009.  (Underlying Compl. ¶ 78.)  On June 16, 2009, the EPA perfected a lien on the Property per Section 107(l) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq. ("CERCLA").[1]

---

[1] CERCLA § 107(l) provides:

All costs and damages for which a person is liable to the United States under subsection (a) of this section (other than the owner or operator of a vessel under paragraph (1) of subsection (a) of this section) shall constitute a lien in favor of the United States upon all real property and rights to such property which--

(A) belong to such person; and

(B) are subject to or affected by a removal or remedial action.

42 U.S.C. § 9607(l)(1).

On May 12, 2010, Teruya filed the Underlying Complaint which alleges sixteen causes of action against a number of Defendants including Hawk. (See Underlying Compl. at 1, 17–32.)  Specifically, Teruya asserts only the following causes of action against Hawk:

- Count I:     Violation of CERCLA.   (Id. ¶¶ 85–96.)

- Count II:    Declaratory Relief under CERCLA.  (Id. ¶¶ 97–99.)

- Count III:   Reimbursement and Cost Recovery under CERCLA. (Id. ¶¶ 100–01.)

- Count IV:    Contribution under CERCLA.  (Id. ¶¶ 102–03.)

- Count V:     Violation of Hawaii Environmental Response Law, HRS § 128D-1 et seq. ("HERL").  (Id. ¶¶ 104–14.)

- Count VI:    Indemnity and Contribution under HERL.  (Id. ¶¶ 115–16.)

- Count VII:   Declaratory Relief under HERL.  (Id. ¶¶ 117–18.)

- Count X:     Voluntary Waste.  (Id. ¶¶ 127–36.)

- Count: XI:   Permissive Waste.  (Id. ¶¶ 137–45.)

- Count XIII:  Trespass.  (Id. ¶¶ 146–54.)

- Count XIV:  Nuisance.  (Id. ¶¶ 162–67.)

With respect to Counts I–IV, Teruya alleges that Hawk accepted hazardous substances for transport to a disposal site on the Property from which there was a release of hazardous substances which caused the incurrence of response costs.  (Id. ¶ 87.)  Teruya alleges that Hawk willfully, knowingly or recklessly failed to comply with CERCLA.  (Id. ¶ 90.)  Accordingly, Teruya claims he is entitled to relief in the form of declaratory judgment, reimbursement, cost recovery, civil penalties, contribution and other remedies.  (Id. ¶¶ 96–103.)

Counts V–VII allege that in violation of HERL, Hawk accepted hazardous substances for transport to a disposal site on the Property from which there was a release of hazardous substances which caused the incurrence of response costs.  (Id. ¶ 106.)  As with the CERCLA Counts, Teruya alleges that Hawk willfully, knowingly or recklessly failed to comply with HERL.  (Id. ¶ 109.) Teruya alleges he sustained damages for which Hawk is jointly and severally liable to him for the following: costs of removal and remedial actions; costs of any health assessment or health effects; injury to, destruction or loss of natural resources, including the reasonable costs of assessing such injury, destruction or loss resulting from such releases; any health assessments or health effects study; and any other necessary costs of response incurred.  (Id. ¶¶ 110–14.)  Teruya also

seeks reimbursement, indemnity, declaratory and injunctive relief pursuant to HERL.  (Id. ¶¶ 115–18.)

In Count X, Voluntary Waste, Teruya alleges Hawk transferred to, disposed of and released substances on the Property that were harmful, hazardous, injurious to persons or property and controlled and/or regulated ("Harmful Substances").  (Id. ¶ 128.)  Teruya further alleges that the use of Harmful Substances on the Property wrongfully destroyed, altered, misused, damaged and/or neglected the Property.  (Id. ¶ 129.)  Teruya claims Hawk did not exercise reasonable care and did not comply with applicable rules in its use and disposal of Harmful Substances.  (Id. ¶¶ 130–31.)  Teruya claims this conduct has diminished the value of the Property, and caused him to incur attorney fees and other expenses. (Id. ¶ 135.)

Count XI alleges Permissive Waste.  In this Count Teruya alleges Hawk by its conduct neglected, omitted, or permitted actions to be taken on the property that damaged or constituted waste and that such conduct was wrongful. (Id. ¶ 138.)  Teruya alleges Hawk did not exercise ordinary and reasonable care for the preservation and protection of the Property and failed to comply with applicable laws with respect to Harmful Substances.  (Id. ¶¶ 139–40.)  Teruya

claims this conduct has diminished the value of the Property, and caused him to incur attorney fees and other expenses.  (Id. ¶ 144.)

Finally in Counts XII and XIV, Teruya alleges trespass and nuisance arising from the continuing presence of solid and/or hazardous waste on the Property that Hawk has not removed.  Teruya alleges that he sustained damages and seeks punitive damages, claiming that Hawk's conduct was malicious, intentional and in conscious disregard of Teruya's rights.  (Id. ¶¶ 160–61, 166–67.)

II.    The Policy

Hawk is the named insured on the Nautilus Policy, policy number NC754658 (the "Policy"), for a policy period from February 8, 2008 to February 9, 2009.  (See "Policy," Doc. # 19-3, at 2.)  Relevant for instant purposes, the Policy provides coverage as follows:

> [Nautilus] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit that may result. . . .

8

This insurance applies to "bodily injury" and "property damage" only if . . . [t]he bodily injury or property is caused by an occurrence that takes place in the coverage territory.

(Id. at 9.)  The Policy also contains three relevant exclusions.  The first, the Total

Pollution Exclusion, provides as follows:

This insurance does not apply to . . .

> f.    **Pollution**
>
> (1) "Bodily injury" or "property damage" arising out of the actual alleged or threatened discharge, dispersal seepage, migration, release or escape of "pollutants" at any time.
>
> (2) Any loss, cost or expense arising out of any:
>
> > (a) Request, demand, order or statutory regulatory requirement that any insured or others test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or
> >
> > (b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants"; or
> >
> > (c) Requirements by the Environmental Protection Agency (EPA) 40 CFR Parts 280 and 281 for underground storage tanks, Comprehensive Environmental Response Compensation and Liability Act (CERCLA) or any similar State or Federal environmental act(s).

(Id. at 33.)[2]  Pollutants, per the policy, "means any solid, liquid, gaseous or thermal irritant or containment including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes, but is not limited to, materials to be recycled, reconditioned or reclaimed."  (Id.)

The Policy also contains a Contractors and Subcontractors Exclusion, which provides:

> This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of work performed by any contractor or subcontractor whether hired by or on behalf of any insured, or any acts or omissions in connection with the general supervision of such work.

(Id. at 35.)

Finally the Policy contains an Auto exclusion which states that the Policy does not provide coverage to:

---

[2] The Court notes that the Total Pollution Exclusion is an endorsement to the policy which modified the original Pollution Exclusion.  (Compare Policy at 33 with 10.)  The Court also notes that Nautilus did not provide pincites to any section or provision of the Policy.  In the future Nautilus, as well as all litigants, must cite to relevant documentation, especially in a Motion for Summary Judgment.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (noting that the burden falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact").

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

(Id. at 11.) Relevant to this exclusion, the Policy contains the following definitions:

"Auto" means:
a.    A land or motor vehicle, trailer or semi trailer designed for travel on public roads, including any attached machinery or equipment; or
b.    Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. . . .

"Loading or unloading" means the handling of property:
a.    After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";
b.    While it is in or on an aircraft, watercraft or "auto"; or
c.    While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

(Id. at 19.)

III.    Procedural History

On August 30, 2010, Nautilus agreed to participate in the defense of Hawk in the Underlying Suit subject to a reservation of rights.  (See Doc. # 1-2.)

On October 15, 2010, Nautilus filed the instant Complaint for Declaratory

11

Judgment. ("Compl.," Doc. # 1.)  Specifically, Nautilus seeks "[a] declaratory judgment . . . that there is no coverage under the [Policy] for the claims against Hawk, and Nautilus therefore does not have a duty to defend and/or indemnify Hawk in the [Underlying Suit.]"  (<u>Id.</u> at 34.)  Nautilus also seeks costs for bringing the instant action as well as defense fees and costs expended in the Underlying Suit.  (<u>Id.</u> at 35.)

On January 14, 2011, Nautilus filed the instant Motion for Summary Judgment.  ("Mot.," Doc. # 18.)  Hawk did not file an Opposition.[3]  On April 25, 2011, Nautilus filed a Reply again requesting Summary Judgment in its favor. (Doc. # 23.)

<u>STANDARD OF REVIEW</u>

Rule 56 requires summary judgment to be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to

---

[3] The Court notes that Hawk had to file an Opposition on or before April 18, 2011.  After the deadline passed, the Court reached out to Counsel for Hawk to notify Counsel of the deadline.  Hawk nonetheless declined to file an Opposition. At the Hearing, Counsel for Hawk clarified that he was instructed by his client not to oppose the Motion.

dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett,
477 U.S. 317, 323–24 (1986).

Summary judgment must be granted against a party that fails to
demonstrate facts to establish what will be an essential element at trial.  See id. at
323.  Before granting summary judgment, however, a non-moving party must have
a "'full and fair opportunity to ventilate the issues  [related to] the . . . claims.'"
Norse v. City of Santa Cruz, 629 F.3d 966, 972–73 (9th Cir. 2010) (quoting Greene
v. Solano Cnty. Jail, 513 F.3d 982, 990 (9th Cir. 2008).

A moving party without the ultimate burden of persuasion at trial —
usually, but not always, the defendant — has both the initial burden of production
and the ultimate burden of persuasion on a motion for summary judgment.  Nissan
Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The
burden initially falls upon the moving party to identify for the court those "portions
of the materials on file that it believes demonstrate the absence of any genuine
issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809
F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).  This
assertion must be supported by citations "to particular parts of materials in the
record, including depositions, documents, electronically stored information,
affidavits or declarations, stipulations, . . .admissions, interrogatory answers, or

other materials," or by demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  Porter, 419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").  "[A]t least some 'significant probative evidence'" must be produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134.  Further, the Ninth Circuit has "refused to find a 'genuine issue' where the only evidence presented is

'uncorroborated and self-serving' testimony." <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing <u>Kennedy v. Applause, Inc.</u>, 90 F.3d 1477, 1481 (9th Cir. 1996). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." <u>Rivera v. Nat'l R.R. Passenger Corp.</u>, 331 F.3d 1074, 1078 (9th Cir. 2003). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, a court may either give the party an opportunity to support or address the fact, consider the fact undisputed for purposes of the motion and grant or deny summary judgment accordingly, or issue any other appropriate order. Fed. R. Civ. P. 56(e).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. <u>Porter</u>, 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. <u>Id.</u>; <u>see also</u> <u>Nelson v. City of Davis</u>, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (citations omitted). However, inferences

may be drawn from underlying facts not in dispute, as well as from disputed facts

that the judge is required to resolve in favor of the nonmoving party.  T.W. Elec.

Serv., 809 F.2d at 631.

DISCUSSION

I.      Hawaii Insurance Law

State law governs the resolution of substantive issues in this diversity

action.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Snead v. Metro. Prop.

& Cas. Ins. Co., 237 F.3d 1080, 1090 (9th Cir. 2001).  When interpreting state law,

a federal court is bound by the decisions of a state's highest court.  Ariz. Elec.

Power Coop. v. Berkeley, 59 F.3d 988, 991 (9th Cir. 1995).  In the absence of a

governing state decision, a federal court attempts to predict how the highest state

court would decide the issue, using intermediate appellate court decisions,

decisions from other jurisdictions, statutes, treatises, and restatements as guidance.

Id.; see also Burlington Ins. Co. v. Oceanic Design & Constr., Inc., 383 F.3d 940,

944 (9th Cir. 2004) ("To the extent this case raises issues of first impression, our

court, sitting in diversity, must use its best judgment to predict how the Hawaii

Supreme Court would decide the issue." (quotation and brackets omitted)).

Insurance policies are subject to the general rules of contract

construction.  Dawes v. First Ins. Co. of Haw., Ltd., 883 P.2d 38, 42 (Haw. 1994).

Under Hawaii law, construction of a contract, where material facts are undisputed, is a question of law for the court. See Nat'l Union Fire Ins. Co. v. Reynolds, 889 P.2d 67, 71 (Haw. App. 1995); Cho Mark Oriental Food v. K & K Int'l, 836 P.2d 1057, 1064 (Haw. 1992). Thus, summary judgment is appropriate when a court determines, as a matter of law, that the terms of an insurance policy do not provide coverage. See Crawley v. State Farm Mut. Auto. Ins. Co., 979 P.2d 74, 78 (Haw. App. 1999); Foote v. Royal Ins. Co. of Am., 962 P.2d 1004, 1008 (Haw. 1998).

The terms of insurance policies must be interpreted according to their plain, ordinary, and accepted sense in common speech, unless it appears from the language of the policies that a different meaning is intended. Nat'l Union, 889 P.2d at 71. Insurance polices are contracts of adhesion and must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer. Tri-S Corp. v. W. World Ins. Co., 135 P.3d 82, 98 (Haw. 2006) (citation omitted). Additionally, insurance policies must be construed in accord with the reasonable expectations of a layperson. Id.

An "[a]mbiguity exists . . . only when the [policy] taken as a whole, is reasonably subject to differing interpretation. Absent an ambiguity, the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech . . . ." Oahu Transit Servs., Inc. v. Northfield Ins. Co.,

112 P.3d 717, 722 n.7 (Haw. 2005) (brackets in original) (citation omitted). When interpreting insurance policies, courts should look to the entirety of their terms and conditions. AIG Haw. Ins. Co. v. Estate of Caraang, 851 P.2d 321, 326 (Haw. 1993).

"'[L]iability insurers have the same rights as individuals to limit their liability, and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions or public policy.'" Liberty Mut. Ins. Co. v. Sentinel Ins. Co., Ltd., 205 P.3d 596, 614–15 (Haw. App. 2009) (quoting First Ins. Co. of Haw. v. State, 665 P.2d 648, 655 (Haw. 1983)). The burden is on the insured to establish coverage under an insurance policy. See Sentinel Ins. Co. v. First Ins. Co. of Haw., 875 P.2d 894, 909 n.13 (Haw. 1994). The insurer has the burden of establishing the applicability of an exclusion. See id. at 914.

The duty to indemnify is owed "for any loss or injury which comes within the coverage provisions of the policy, provided it is not removed from coverage by a policy exclusion." Dairy Rd. Partners v. Island Ins. Co. Ltd., 992 P.2d 93, 108 (Haw. 2000). "[T]he obligation of an insurer to defend its insured is separate and distinct from an insurer's obligation to pay a judgment against its insured." First Ins., 665 P.2d at 416–17. An insurer's duty to defend is contractual

18

in nature, and courts "must look to the language of the particular policy involved to determine the scope of that duty." Commerce & Indus. Ins. Co. v. Bank of Haw., 832 P.2d 733, 735 (Haw. 1992) (citation omitted). Under Hawaii insurance law, the duty to defend arises whenever there is a potential for indemnification liability from the insurer to the insured. Hawaiian Holiday Macadamia Nut Co. v. Indust. Indem. Co., 872 P.2d 230, 233 (Haw. 1994); see also Burlington, 383 F.3d at 944. The duty to defend is thus much broader than the duty to indemnify and does not depend on whether liability is ultimately established. Commerce, 832 P.2d at 735. Under the "complaint allegation rule," the duty to defend is determined at the time that the defense is tendered to the insurer or the insurer otherwise is on notice that a complaint has been filed against its insured. See, e.g., Dairy Rd. Partners, 992 P.2d at 108–16; Commerce, 832 P.2d at 735; Pancakes of Haw., Inc. v. Pomare Props. Corp., 944 P.2d 83, 88 (Haw. App. 1997). For the duty to defend to arise, the potential insured need only show that the underlying claim may fall within policy coverage. Dairy Rd. Partners, 992 P.2d at 108–16 (emphasis added).

Where the pleadings fail to allege any basis for recovery within the coverage of the subject policy, the insurer has no obligation to defend. Hawaiian Holiday, 872 P.2d at 233. In determining whether coverage exists under a liability policy, Hawaii courts do not look at the means by which a litigant states a claim,

19

but rather at the underlying <u>facts</u> alleged in the pleadings.  <u>See</u> <u>Oahu Transit Servs.</u>, 112 P.3d at 721; <u>Bayudan v. Tradewind Ins. Co.</u>, 957 P.2d 1061, 1069 (Haw. App. 1998).

II.    <u>Coverage</u>

Nautilus proffers two arguments as to why coverage should be excluded.  Nautilus first contends that any potential liability in the Underlying Suit is completely excluded by the Total Pollution Exclusion.  (Mot. at 11–17.) Nautilus also argues that any potential liability in the Underlying Suit is excluded by both the Contractors and Subcontractors Exclusion as well as the Auto Exclusion.  The Court agrees with both arguments and finds that Nautilus is entitled to Summary Judgement.

A.    <u>Total Pollution Exclusion</u>

As noted, the Pollution Exclusion states that there is no coverage under the Policy for

(1) "Bodily Injury" or "property damage" arising out of the actual alleged or threatened discharge, dispersal seepage, migration, release or escape of "pollutants" at any time.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory regulatory requirement that any insured or others test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants"; or

(c) Requirements by the Environmental Protection Agency (EPA) 40 CFR Parts 280 and 281 for underground storage tanks, Comprehensive Environmental Response Compensation and Liability Act (CERCLA) or any similar State or Federal environmental act(s).

(Policy at 33.)

The Total Pollution Exclusion clause here at issue has been the subject of "conflicting judicial decisions throughout the country." Apana v. TIG Ins. Co., 574 F.3d 679, 682 (9th Cir. 2009). Generally, State courts fall into one of two broad camps. The first applies the exclusion literally, finding the terms to be clear and unambiguous. See id. (listing state court decisions applying terms of Total Pollution Exclusion clause literally). The second camp limits the exclusion "to situations involving traditional environmental pollution, either because they find the terms of the exclusion to be ambiguous or because they find that the exclusion contradicts policyholder's reasonable expectations." See id. (listing state court

decisions applying terms of Total Pollution Exclusion clause to situations involving "traditional environmental pollution.")

This District has not been immune from the nationwide confusion relating to the scope of this clause. The Hawaii Supreme Court has not yet opined on which approach it would adopt. This Court, in a 2004 decision, applied the exclusion literally and found the terms of this clause to be clear and unambiguous. See Allen v. Scottsdale Ins. Co., 307 F. Supp. 2d 1170, 1176 (D. Haw. 2004). Three years later, United States District Judge J. Michael Seabright concluded similarly, finding that "[n]othing in the language of the [clause] references or even impliedly limits the clause to instances of traditional environmental pollution . . . ." Apana v. TIG Ins. Co., 504 F. Supp. 2d 998, 1006 (D. Haw. 2007). Judge Seabright's decision, however, was appealed to the Ninth Circuit. There, the panel did not immediately rule on Judge Seabright's decision, but instead certified a question to the Hawaii Supreme Court asking whether the clause was "limited to situations that a reasonable layperson would consider traditional environmental pollution[.]" Apana, 574 F.3d at 684. The Ninth Circuit certified this question because Hawaii case law indicated that Hawaii "might enforce a lay person's reasonable expectations even if 'painstaking study' of the

pollution exclusion would require a different result." Id. at 683.  Before the

Hawaii Supreme Court could answer the question, however, the parties settled.[4]

Fortunately, the Court need not here resolve the issue of which test

Hawaii would apply.[5]  The Court here concludes that even applying the more

liberal test—i.e. the test which limits the exclusion "to situations involving

traditional environmental pollution"—Nautilus is entitled to summary judgment

because the pollutants alleged to have been dispersed in the Underlying Suit

involve "traditional environmental pollution" and would not be contrary to "a lay

person's reasonable expectations" of the Total Pollution Exclusion clause.  Id.

The California Supreme Court recently described the "traditional

environmental pollution" test as follows:

> The key to this inquiry, we believe, turns on the meaning of the term
> "pollutant."  Because the definitional phrase "any irritant or
> contaminant" is too broad to meaningfully define "pollutant," we must
> turn to the common connotative meaning of that term.  This position
> was well articulated by the court in Regional Bank of Colorado v. St.
> Paul Fire and Marine Ins. Co., 35 F.3d 494 (10th Cir. 1994),
> interpreting Colorado law, when considering whether carbon

---

[4] Since the time of the Ninth Circuit panel's comment in its order certifying the question regarding the bent of the Hawaii Supreme Court the composition of the Hawaii Supreme Court has changed and this expectation may no longer hold true.

[5] The Court notes, however, it considered certifying the very same question asked by the Ninth Circuit to the Hawaii Supreme Court.

monoxide fumes from a residential heater should be considered pollution: "A reasonable policy holder would not understand the policy to exclude coverage for anything that irritates. 'Irritant' is not to be read literally and in isolation, but must be construed in the context of how it is used in the policy, <u>i.e.</u>, defining 'pollutant.' While a reasonable person of ordinary intelligence might well understand carbon monoxide is a pollutant when it is emitted in an industrial or environmental setting, an ordinary policyholder would not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as 'pollution.' It seems far more reasonable that a policyholder would understand it as being limited to irritants and contaminants commonly thought of as pollution and not as applying to every possible irritant or contaminant imaginable." <u>Id.</u> at 498; <u>accord Stoney Run Co. v. Prudential–LMI Commercial Ins. Co</u>., 47 F.3d 34, 38 (2d Cir. 1995).

<u>MacKinnon v. Truck Ins. Exch.</u>, 73 P.3d 1205 (Cal. 2003). Accordingly, a court divines from the circumstances whether a reasonable policy holder would consider the substance at issue to be a pollutant in the specific context of the underlying case. <u>See, e.g.</u>, <u>Porterfield v. Audubon Indem. Co.</u>, 856 So. 2d 789, 805 (Ala. 2002) (concluding "a reasonably prudent insured might have concluded in 1991 that the presence of lead-paint flakes, chips, and/or dust in a residential apartment would not qualify as a discharge, dispersal, release, or escape of a pollutant"); <u>Belt Painting Corp. v. TIG Ins. Co.</u>, 795 N.E.2d 15, 20 (N.Y. 2003) ("It cannot be said that this language unambiguously applies to ordinary paint or solvent fumes that drifted a short distance from the area of the insured's intended use and allegedly caused inhalation injuries to a bystander.") <u>Kent Famrs, Inc. v. Zurich Ins. Co.</u>, 998

P.2d 292, 399 (Wash. 2000) (concluding that "the fact that a pollutant appears in the causal chain [does not trigger] application of the exclusion clause" where the "plaintiff alleges negligence in the maintenance and design of a fuel storage facility").

Here, a reasonable insured could only conclude that the discharged substances in the Underlying Suit were "traditional environmental pollut[ants]." The Underlying Complaint alleges that Hawk subcontracted Ivory to "transport solid and/or hazardous waste to the Property from . . . road work being done by Coluccio." (Underlying Compl. ¶¶ 49, 50.) These materials were alleged to have been "harmful, hazardous, injurious to persons or property and controlled and/or regulated." (Id. ¶ 128.) Teruya also alleges that the EPH and DOH found: numerous containers of waste oil, paints, solvents and greases; lead acid batteries and associated wastes; open burn pits; five-gallon buckets and drums; a graded and filled area that appeared to have been used for industrial activities; used sand blast grit on the graded and filed area; piles of ash and burnt metal debris; fill material which appeared to have been filed with a mixture of construction and demolition debris' and a metal scrapping and salvaging operation. (PCSF ¶ 10.) Teruya alleges the EPA colleted and analyzed over 1200 soil samples from the Property which documented the presence of hazardous substances. (Id. ¶ 11.) These

materials were allegedly placed on the Property as a means of disposing of them. Indeed, Hawk's alleged role in this polluting scheme was to dispose of <u>waste generated from road work</u>. This is not a case where lead gradually flaked away from paint within an apartment, <u>see</u> <u>Porterfield</u>, 856 So. 2d at 805, or fumes spread from an insured's paint or solvent while being used for its ordinary purpose, <u>see</u> <u>Belt Painting Corp.</u>, 795 N.E.2d at 20. Nor does the Underlying Complaint allege that a drain cleaner poured into a drain inadvertently caused injury to other people. <u>See</u> <u>Apana</u>, 574 F.3d at 681. Instead, here, allegedly toxic materials were intentionally dumped on land which was intended for agricultural use. Indeed, the EPA and DOH helped with the pollutants' removal. Moreover, the underlying causes of action stem from this conduct alone. The pollutants at issue here more than qualify as "traditional environmental pollution."[6] A reasonable policyholder could only therefore conclude the Policy was intended to exclude precisely this type of conduct.[7]

_____

[6] Indeed, the Court cannot conceive of a scenario which better illustrates "traditional environmental pollution."

[7] The Court notes that applying the exclusion literally it would reach the same result because the materials dumped on the land plainly fall within the Policy's definition of "pollutant." (<u>See</u> Policy at 33 (pollutants defined as "any solid, liquid, gaseous or thermal irritant or containment including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste").)

26

Accordingly, the waste found on the Property as alleged in the Underlying Suit are "pollutants" within the meaning of the Policy. Thus, Nautilus is entitled to Summary Judgment. Counts X (Voluntary Waste), XI (Permissive Waste), XIII (Trespass), and XIV (Nuisance) are premised upon the presence of pollutants on the Property. Moreover, the exclusion explicitly exempts coverage for any loss, cost or expense arising out of any "[r]equest [or] demand . . . that any insured clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of pollutants." Thus, to the extent that Teruya alleges in Counts I through VII that Hawk is responsible for removal and remedial actions as well as assessing injury to, destruction of, or loss resulting from the release of hazardous substances, Nautilus is entitled to Summary Judgment. Finally, the Total Pollution Exclusion expressly excludes coverage for any loss, cost or expense arising out of any requirements per CERCLA or any similar State or Federal environmental act. Thus, to the extent the Underlying Suit seeks recovery against Hawk pursuant to CERCLA and HERL, coverage is barred. In sum, the Total Pollution Exclusion alone suffices as grounds to grant Nautilus's Motion.

## B. Contractor and Subcontractor Exclusion and Auto Exclusion

In the alternative, coverage is precluded by both the Contractor and Subcontractor Exclusion as well as the Auto Exclusion. Beginning with the Contractor and Subcontractor exclusion, it provides:

> This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of work performed by any contractor or subcontractor whether hired by or on behalf of any insured, or any acts or omissions in connection with the general supervision of such work.

(Policy at 35.) Although there is no Hawaii case law specifically interpreting this exclusion, as discussed <u>supra</u>, the terms of an insurance policy should be given their plain and ordinary meaning consistent with the reasonable expectations of the insured. <u>See</u> <u>Nat'l</u> <u>Union</u>, 889 P.2d at 71; <u>Tri-S Corp.</u>, 135 P.3d at 98.

In this case the Underlying Complaint <u>explicitly alleges</u> that Hawk <u>subcontracted</u> Ivory Transport to transport waste to the Property from road work being done by Coluccio. (Underlying Compl. ¶ 49.) Teruya further alleges that Hawk and Ivory Transport transported waste to the Property. (<u>Id.</u> ¶ 50.) Teruya also alleges that as a result of this conduct, there was injury to the Property. (<u>Id.</u> ¶ 72.) Plainly then, to the extent that Teruya alleges that damages arise out of Ivory Transport's conduct or Hawk's conduct in managing or supervising Ivory Transport, coverage is precluded by this exception.

Second, the Auto Exception provides that insurance coverage will not

apply to:

> "Bodily injury" or "property damage" arising out of the ownership,
> maintenance, use or entrustment to others of any aircraft, "auto" or
> watercraft owned or operated by or rented or loaned to any insured.
> Use includes operation and "loading or unloading."

(Policy at 11.)

Hawaii courts apply a three-part test in order to determine whether an

injury arises from the use or operation of a motor vehicle:

> The first factor [is] whether the . . . motor vehicle was an active
> accessory in causing [the] plaintiff's injuries . . . .
> The second factor [is] whether there was an independent act breaking
> the causal link between "use" of the vehicle and the injuries
> inflicted . . . .
> The third factor [is] whether the injuries resulted from use of the
> vehicle for transportation purposes[.]

Oahu Transit Servs., 112 P.3d at 722 (citation omitted, brackets and marks in

original). In Oahu Transit Services, the operator of Oahu's bus service sought

coverage under its commercial general liability ("CGL") policy for claims arising

from an incident in which a disabled passenger suffered a spinal cord injury after a

handivan driver unfastened the seat belt securing the passenger in his wheelchair.

Id. at 719. The insurance policy at issue included an exclusion for "[b]odily injury

or property damage arising out of the ownership, maintenance, use or entrustment

to others of any aircraft, auto or watercraft owned or operated by or rented or loaned to any insured." Id. at 718.

The Hawaii Supreme Court found the phrase "arising out of the ownership, maintenance, [or] use" to be unambiguous based upon precedent. Id. at 721. The court then applied the exclusion to the claims against the transit company and found that under the three-part test, the underlying lawsuit arose from the use or operation of an automobile because: 1) the van was an active accessory in the plaintiff's injury—its movement caused his wheelchair to tip over, which led to the driver's attempts to free him and, ultimately, to the passenger's injuries; 2) the van was used in transportation because the plaintiff was injured while a passenger; and 3) the driver's act of unbuckling the passenger's seat belt was not an "independent act" breaking the casual link between the use of the automobile and the plaintiff's injury because the transit operator was in the business of transporting passengers, and therefore, the driver's actions were not "independent" from the use of an automobile. Id. at 723.

Here, the Court finds that the three factors weigh in favor of finding the Auto Exclusion applies as well. The first factor—whether the vehicles used to transport the substances were an active accessory in causing the injuries—weighs in favor of Nautilus. The conduct of which Teruya complains with respect to

Hawk is the <u>transport</u> and <u>unloading</u> of pollutants on the Property.  As the Hawaii Supreme Court explained, "The insuring term 'use or operation' encompasses more than just driving a vehicle."  <u>Id.</u> (quotations and citations omitted).  Here, the transport of the materials to the site was a fundamental aspect of the complained of conduct which lead to Teruya's alleged injuries—it was the means by which the pollutants were deposited on the Property.  While perhaps not the catalyst for the injury itself as in <u>Oahu Transit</u>, the Hawaii Supreme Court in discussing this particular factor has stated that

> the causal requirement has been held to be more than "but-for" causation, but less than legal proximate cause.  That is, to prove causation under a policy covering losses arising from "use" of a covered vehicle, the plaintiff need only show that the injury originated in, grew out of, or flowed from the use of the vehicle, <u>not that the vehicle itself was the source of the injury</u>.

 112 P.3d at 723 n.11 (emphasis added) (citations omitted).  In the instant case the injury certainly flowed from the use of the vehicle—the transport of the pollutants to the Property lead to the injury complained of by Teruya.  Moreover, the Policy states explicitly that "[u]se includes operation and 'loading or unloading,'" further bolstering this conclusion.  As discussed, "loading and unloading" is defined as "the handling of property . . . [w]hile it is being moved . . . to the place where it is finally delivered."  (Policy at 19.)  Thus, the automobile was "in use" for purposes

of the Policy even as the pollutants were deposited on the Property. This "use" of the vehicle—the "unloading" of the pollutants on the Property—directly caused the complained of injury. The Court, therefore, can only conclude that the vehicle was a prime accessory in causing the property damage.

The second factor—whether there was an independent act breaking the causal link between "use" of the vehicle and the injuries inflicted—plainly weighs in Nautilus's favor. The unloading of the pollutants directly caused the complained of injury. While it is true that Teruya's request for contribution and indemnification under CERCLA and HERL stem in part from the fact that the EPA and DOH had cleaned the Property, the <u>injury</u> to the Property arises from Hawk's depositing the pollutants on the property in the first place. <u>See</u> <u>Oahu Transit</u>, 112 P.3d at 722 ("The second factor [is] whether there was an independent act breaking the causal link between "use" of the vehicle and the <u>injuries inflicted</u> . . . ." (emphasis added)) Accordingly, the EPA and DOH's remediation of the property was not an "independent act" breaking the causal link, and this second factor weighs in favor of finding the Auto Exclusion applies.

The final factor—whether the injuries resulted from use of the vehicle for transportation purposes—also weighs in favor of finding the exclusion applies. Hawk allegedly caused the injury to Teruya by transporting the pollutants to the

32

Property.  Accordingly, the injuries resulted from the use of the vehicle for transportation purposes.

Applying these three factors, the Court concludes that Hawk's alleged misconduct in the Underlying Suit arose out of the use or operation of an automobile.  Consequently, the Policy's Auto Exclusion bars coverage in the instant case for any of Hawk's conduct.  This exclusion, together with the Contractors and Subcontractors Exclusion, therefore completely precludes coverage in the Underlying Suit.  As alleged in the Underlying Suit, Hawk's liability can only arise from the conduct of Ivory Transport, Hawk's subcontractor, in transporting the pollutants to the property, or Hawk's own conduct in transporting the pollutants to the property.  The former scenario is barred by the Contractor and Subcontractor Exclusion while the latter is barred by the Auto Exclusion.  The Court therefore **GRANTS** Nautilus's Motion for Summary Judgment.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Nautilus's Motion for

Summary Judgment (Doc. # 18).

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 20, 2011.

_____
David Alan Ezra
United States District Judge

<u>Nautilus Insurance Company v. Hawk Transport Services, LLC</u>, CV. NO. 10-
00605 DAE-RLP; ORDER GRANTING NAUTILUS INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT